374 P.2d 513

Darwin PETERSON and Lamont Vance, doing business as Peterson & Vance, a partnership, Plaintiff and Respondent,

v.

HANSEN–NIEDERHAUSER, INC., a corporation, et al., Defendants and Appellants.

No. 9485.

Supreme Court of Utah.

Sept. 19, 1962.

Leonard W. Elton and Robert D. Moore, Salt Lake City, for appellants.

L. E. Midgley, Salt Lake City, for respondent.

ERICKSON, District Judge.

This is a tort action to recover damages for the destruction of plaintiff's truck terminal building and contents, caused when defendants, while excavating a trench on plaintiffs' property, severed a gas line, which igniting, destroyed the building and its contents.

The case was tried to a jury and from a verdict for the plaintiff, defendants appeal. For convenience, the defendants will be referred to as the appellant, while the plaintiff will be known as the respondent.

**356**

On April 20, 1960, the appellant was engaged in excavating a trench across respondent's property in Woods Cross, Utah. An employee of the appellant was using a back-hoe in digging the trench in front of respondent's property. Shortly before the back-hoe reached the area where the gas line was buried, an employee of the respondent confronted the operator of the back-hoe and appellant's foreman, advising them of the approximate location of the gas line serving respondent's property. It was pointed out by the employee he didn't know the depth of the gas line but a well-marked indentation on the ground indicated the location of the line. He further advised the operator and foreman that the indentation had been caused by loaded trucks passing over this gas line trench in the spring of the year when the ground was soft.

The respondent's testimony described the truck terminal building, its contents, value and kindred matters. The respondent called, as his witness, Paul Yoeman, who was operating the back-hoe at the times herein referred to. Yoeman described the back-hoe he was then operating. He admitted that he was aware of the covered gas line serving the respondent's truck terminal building. He testified the back-hoe was powered by an 80-horse-power motor with a torque converter. He testified the gas company furnished him with a map, and from this map he assumed the gas line ran "pretty square from the meter to the road." He admitted that on previous trench-digging jobs he had used a *hydro-back-hoe,* equipment less powerful than that used on this job. Yoeman testified that it was his practice to locate the gas, water or other line, then "gradually dig down with the smaller hoe"; if the crust was hard, he made a first pass to remove this crust. On this job, when he took this first bite with the back-hoe, it hooked and severed the gas line. "I heard the line pop off the meter." This witness on cross-examination testified that he expected to find this particular gas line some two to three feet below the level of the ground, which was the approximate depth of other lines on other jobs. This witness testified that he was acquainted with the custom and practice of those engaged in the trenching business. "You just look at it, the thing is, get the crust off, so a man can get down with a shovel." On direct examination this witness was asked and gave the following answers:

"Q You say it is the usual practice in the industry to take the crust off with a power shovel?

"A Yes.

"Q What other contractor does it?

"A Al Larson & Nielsen do it.

"Q Do all of them do it?

"A I don't know.

It is undisputed that this particular gas line when struck by the back-hoe was 10 to 12 inches below the surface.

Respondent called as his witness Lynn A. Skabelund, a contractor and subdivider of Logan, Utah, who testified he had been engaged in this business of excavating for 18 years. He had done trenching work during this period of time, and he was asked: "Are you acquainted with the custom and practice of other contractors in digging trenches, particularly in connection with gas lines?" His answer: "I have been." Question: "What is the custom and procedure followed by the contractors generally based on your knowledge and experience?" Answer: "Well, I first find where the gas line is laid out by the gas company, then we dig up to a couple of feet of where we figure the line is, then dig by hand, or cave the back away until we find it."

This witness admitted that his experience in trenching was limited to the Logan area. On cross-examination, this witness was asked this question: "Tell the jury what your experience has been in handling the situation?" Answer: "Well, the first thing I try to do is avoid a gas line. I am very scared of them. I know what can happen. Whenever there is any injury done to the line, we are supposed to call the gas company. They will come and repair it and they make a record of the things, in case something happens you are not liable." Counsel for respondent then put this ques-

tion to Skabelund: "How do you operate?" Answer: "I certainly keep a man there watching; there is a man digging and we are careful where the gas lines are. We have them marked out. Under no circumstances try to dig through, cave a bank from them,—dig around them by hand and proceed through."

It is urged by appellant that the proof of negligence in the instant case revolves around the question of custom and practice as followed in Salt Lake and Davis Counties. It is contended by the appellant that they followed the custom and practice employed by others engaged in this type of work in Salt Lake and Davis Counties. The operator of the back-hoe on this job testified that Larson & Neilson and the appellant follow the practice pursued on this job, while the witness Skabelund testified the approach to a gas line is made more cautiously than the procedure followed by the appellant.

The effect of usage and custom in the field of tort liability is much more limited than in the area of contract, which is to say, custom and usage cannot be relied on to excuse conduct which might otherwise be tortious—nor can the commission of a specific act be proved or disproved by evidence of a custom to do or not to do it. Mere adherence to custom is not in itself the equivalent of due care, to hold otherwise would exalt custom and usage to

a level destructive of the required responsibility of behavior. Mere conformity to custom is but a circumstance, an evidentiary fact, to be assessed and considered in the ultimate determination of whether or not ordinary care has been exercised.

Upon respondent's resting, the following exchange between court and counsel took place: THE COURT: "Anything further, Mr. Midgley?" MR. MIDGLEY: "No, Your Honor." THE COURT: "Mr. Elton?" MR. ELTON: "No, Your Honor."

Whereupon, counsel for the respondent requested that the witness Skabelund be excused, no objection having been made by counsel for the appellant, the court thereupon excused him. Shortly thereafter, counsel for the appellant made a motion to strike, urging that "the testimony of Mr. Skabelund in regard to the subject matter regarding custom and usage of those in the trenching business, of those in this area. He admittedly did not know of anything done in this area. His testimony is predicated entirely on his personal experience in Logan. We heard nothing else, there was no attempt to tie it with what people do in this area down here."

The trial court denied the motion.

After both parties rested, counsel for the appellant moved the court to direct a verdict in appellant's favor, no cause of action on the ground that respondent has shown no basis for relief.

The court denied this motion and the case was submitted to the jury.

The denial of these two motions made by appellant constitutes and becomes the cause for this appeal.

We perceive no error in the trial court's denial of the Motion to Strike and Motion for a Directed Verdict.

■ We hold that the Motion to Strike the testimony of a witness after he has been examined, without objection, cross-examined and later excused without objection is not timely. To permit the Motion to Strike to be thus employed introduces into the trial of a cause the element of risk and advantage. If the testimony of the witness falls short of your expectation, you move to strike and if the testimony yields some strength to your cause you permit it to stand.

This court in Campbell v. Los Angeles and S. L. Ry. Co., 71 Utah 173, 263 P. 495, has quieted this question of the Motion to Strike when it approvingly quoted Jones Commentaries on Evidence (2d Ed.) Sec. 2529, p. 5003: "A Motion to Strike is not a substitute for an objection, nor is it a remedy for him who wants to discover whether the answer to a question patently calling for improper evidence will be favorable or unfavorable. It is not available where the party against whom it is offered makes no objection to questions which clearly call for improper evidence. One who has

thus taken his chances of advantage has not, when he finds the testimony prejudicial, the legal right to exclude it."

As to the issues of fact, we think it unnecessary to examine minutely the evidence on which the jury reached its verdict. Each cause depends on its own circumstances and when the applicable law is applied to these circumstances, the verdict reached cannot be disturbed. There was legal evidence upon which the jury based its verdict. All the testimony pertaining to custom was received in evidence for the purpose of showing the precautions taken as bearing upon the degree of care required.

Mr. Justice Holmes clearly, succintly and, we think, correctly stated the general rule to be applied to custom and usage when he said in Texas & P. R. Co. v. Behymer, 189 U.S. 468, 23 S.Ct. 622, 47 L.Ed. 905, "The charge embodied one of the commonplaces of the law. What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not."

Affirmed. Costs to respondent.

WADE, C. J., and CALLISTER and CROCKETT, JJ., concur.

HENRIOD, J., concurs in result.

McDONOUGH, J., having disqualified himself, did not participate herein.